1
2
3
4
5
6
7

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
IN SEATTLE**

8
9
10
11
12
13

| | |
|---|---|
| SECURE AXCESS, LLC,<br><br>     Plaintiff,<br><br>  v.<br><br>NINTENDO OF AMERICA, INC.<br><br>     Defendant. | No. C14-1013 RSM<br><br>ORDER ON CLAIM<br>CONSTRUCTION |

14
15
16
17

   This patent infringement action is before the Court for a ruling on claim construction. The Court held a *Markman*[1] hearing on the claims at issue in this case on March 20, 2015. Having fully considered the parties' memoranda, exhibits, and relevant authority, the Court now issues this Order as to the meaning of the disputed claim terms.

18

**BACKGROUND**

19
20
21
22
23

   Plaintiff Secure Axcess LLC ("Secure Axcess") originally filed this patent infringement action in the Northern District of Texas against Defendants Nintendo of America, Inc. and Nintendo Co., Ltd. (collectively, "Nintendo"), along with twelve retail defendants. On March 7, 2014, Judge Gilstrap for the Northern District of Texas denied a motion by Nintendo to sever Plaintiff's claims against it and transfer them to this Court. Judge Gilstrap's order was subsequently overturned by the U.S. Court of Appeals for the

---

[1] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

ORDER ON CLAIM CONSTRUCTION - 1

Federal Circuit, and claims against Nintendo were transferred to this Court on July 2, 2014. *See* Dkt. # 1.

Through its First Amended Complaint, Plaintiff alleges that Nintendo has infringed and continues to infringe United States Patent No. 6,522,309 (the "'309 Patent"), titled "Multiscreen Personal Computer Display Method Apparatus." Dkt. # 2 ("FAC"), § IV. The '309 Patent was issued by the United States Patent and Trademark Office ("USPTO") on February 18, 2003 to inventor Harold J. Weber as trustee for SavvyStuff Property Trust and later assigned to Secure Axcess on July 30, 2012. *Id.* at ¶¶ 21-24; Dkt. # 20-2 (" '309 Patent"). It teaches a device, which Weber termed a "translative video adaptor," or "TVA," for viewing and editing documents simultaneously on two or more screens. The invention is described as a "computer providing multiple display capability where one display presents the current document and another display may show a true display of a previously opened document." *Id.* at p. 2 (Abstract).[2]

Plaintiff alleges that Nintendo infringes the '309 Patent by making, importing, and selling Nintendo DS dual-screen handheld consoles, including Nintendo's DS, DS Lite, DSi, DSi XL, 3DS, and 3DS XL systems. Dkt. # 2 ("FAC"), § 1V. Nintendo's DS products are based on U.S. Patent No. 7,786,997 (the "'997 Patent") filed on August 20, 2004 and issued and assigned to Nintendo Co., Ltd. on August 31, 2010 following initial rejection and amendment. FAC at ¶¶ 30-32.

**a) Overview of the '309 Patent**

The TVA was inspired by Weber's apparent frustration with the shortcomings in the ability of PC systems at the time to allow a user to edit a live document while concurrently viewing a separate reference document. While Windows, Linux, and Unix systems allowed concurrent viewing of documents, Weber opined that these programs were "fraught with a major shortfall" in their "fragmented screen appearance" and the "distracting need for switching back and forth" between subwindows. '309 Patent at 2:58-65. According to Weber, these technologies inevitably drove the user to print out a temporary hardcopy of a reference document, an expedient that he viewed as "wasteful of time and paper" and as "less efficient to use than what an eye-level on screen presentation of an immediate predecessory document could provide." *Id.* at 3:13-16. While dual-display systems presented

---

[2] The '309 Patent's Abstract further describes the "computer" as "a singular processed video data signal source which presents a primary monitor with current video data." '309 Patent at Abstract.

ORDER ON CLAIM CONSTRUCTION - 2

an obvious solution, they were at the time plagued with obstacles, including complicated system configurations and the need to use more than one, then-expensive graphics adapter card to feed data from the computer for separate display on the monitors. *Id.* at 3-4.

Weber's invention represented a workaround to these various limitations. The TVA essentially functions by splitting a computer's data stream on its way to the monitor, allowing the computer to send the same data to be read out on two or more monitors. With the TVA in place, the user opens her desired data file, which is presented on the primary monitor. When the user encounters a screen of information that she wishes to employ as a reference, she "grabs" the video signal being fed through the TVA. The TVA stores and sends the grabbed screen image to the secondary display monitor, where the image is held in place as a reference while the user continues to work on the first monitor. *See* '309 *id.* at 4:42-51 & Abstract.

Weber coined the term TVA to describe the invention's technical performance, which the patent describes as follows:

> In effect, my TVA accepts the processed video signal from the computer, firstly translates the video signal into a binary formation for digital memory storage. The digital memory is subsequently read-out and the retrieved binary format data is then secondly translated back into a reconstructed processed video signal format that serves to drive the secondary, or antecedent display monitor and closely replicate the predecessory screen of data.

*Id.* at 9:44-64. The function of the TVA, coupled with an existing computer and two monitors, is depicted in Figures 1 and 2:



The Patent's specification teaches two basic physical embodiments for the TVA. Weber termed the first an "external TVA interface" and described it as the "preferred embodiment of [his] invention." *Id.* at 6:17, 6:30-32. This external TVA is a "standalone accessory device," about the size of a deck of cards, which plugs into the computer and two or more monitors through video cabling. *Id.* at 6:30-32. Using the external TVA, a user can activate the frame-grab by clicking a separate control button (i.e. an accessory mouse) or by executing a unique keystroke sequence on the keyboard, using a transient stay resident

ORDER ON CLAIM CONSTRUCTION - 3

("TSR") software program. *Id.* at 6:50-63. The second embodiment, an "internal TVA," functions identically to the external TVA except that it is installed as a removable "plug-in circuit card" into one of the computer's video card slots. *Id.* at 7:7-20.

Two particular features of the TVA are described as significant advantages over prior art. First, the TVA is designed to be independent of the computer's operating system such that it can function on virtually any operating system, including Windows, MS-DOS, Unix, and Linux. *Id.* at 12:66-13:5. Second, Weber emphasized that, whether external or internal, the TVA "strictly samples the real-time, processed and monitor-ready video data signal ordinarily delivered from the output of the video adapter card." *Id.* at 7:37-39. In other words, the TVA makes use of the primary monitor's fully processed video data stream, as opposed to obtaining the raw video data signal from the computer's internal data bus stream. By using the monitor-ready video data, the TVA can avoid processing and display errors and ensure that an exact replica of the primary monitor screen is displayed on the secondary monitor. *See id.* at 10:55-59 ("The eloquence of my invention is that a faithful duplication of whatever video processing the computer's usual built-in video circuitry provides is absolutely duplicated so as to precisely replicate the primary display presentation on the secondary display monitor.").

The Patent also anticipated specified further uses of the technology, such as the ability to alternate the designation of the primary and secondary (as well as tertiary and other additional) monitors. In other words, the user would be able to initiate a command whereupon the primary monitor becomes the secondary monitor, and vice versa. *Id.* at 11:59-67.

**b) Claim Disputes**

The '309 Patent recites twenty claims. The parties have been unable to agree on the construction of any claim terms. *See* Dkt. # 20, p. 1. They have also been unable to agree on the ten most important disputed claim terms. *See* Local Patent Rule 132 ("The Court will construe a maximum of ten claim terms at the initial Markman hearing, unless the Court determines otherwise."). The parties agree only that the Court should construe the claim term "translative video adapter (TVA)" (Claims 1, 9, and 13).

ORDER ON CLAIM CONSTRUCTION - 4

Secure Axcess submits seven terms in addition to "TVA" that it believes should be construed: (1) first operative means, (2) first conversional means, (3) first memory means, (4) first retrieval means, (5) second conversional means, (6) port, and (7) ported source.

Nintendo asserts that the Court should instead construe the following eight terms at the initial claim construction hearing: (1) predecessory display/supplementary video data/predecessor video data display, (2) first sample of the first screen data/first sample of a first screen portion, (3) TVA input port, (4) video output port/video data signal output port, (5) usually, (6) first converting the first read said first video data signal into a first predecessory video signal/first converting the first read said first stored data into a supplementary display video signal, (7) display-ready first processed video data signal/processed video data signal/display-ready video signal, and (8) intercoupling/intercoupled/coupled. Nintendo additionally asserts that, pursuant to 35 U.S.C. § 112, all of the following "means-plus-function terms" in Claim 13 must at some point be construed by the Court: (1) first operative means, (2) first retrieval means, (3) second conversional means, (4) first conversional means, (5) first memory means, and (6) translative video adapter (TVA) means.

This Order considers each of the disputed claim terms.

**LEGAL STANDARDS**

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). The meaning and scope of the claim language is a question of law within the exclusive province of the court to determine. *Markman*, 517 U.S. at 372. The inquiry into the meaning of claim terms is an "objective one." *Innova/Pure Water*, 381 F.3d at 1116. As a result, when a court construes disputed terms, it "looks to those sources available to the public that show what a person of ordinary skill in the art would have understood the disputed claim language to mean." *Id.*

The appropriate starting point for claim construction is always an examination of the language of the specific asserted claim. *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). The words of a claim are to be given their "ordinary and customary meaning," which is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415

ORDER ON CLAIM CONSTRUCTION - 5

1    F.3d 1303, 1313 (Fed. Cir. 2015). Such a person is "deemed to have read the claim term not

2    only in the context of the particular claim in which the disputed term appears, but in the

      context of the entire patent, including the specification." *Id.*

3
            To determine the "ordinary and customary meaning" of a claim term, a court should

4    first consult the intrinsic evidence, which consists of the claims, the specification, and the

5    prosecution history.  *Primos, Inc. v. Hunter's Specialties, Inc.* 451 F.3d 841, 847-48

      (Fed.Cir.2006) ("In ascertaining the ordinary and customary meaning of a claim term, a

6    court's primary focus should be on the intrinsic evidence of record, viz., the claims, the

7    specification, and, if in evidence, the prosecution history."); *Kinik Co. v. Int'l Trade

8    Commission*, 362 F.3d 1359, 1365 (Fed.Cir.2004) ("The words of patent claims have the

      meaning and scope with which they are used in the specification and the prosecution

9    history."). Prior art cited to during prosecution is considered part of the prosecution history.

10   *See Phillips*, 415 F.3d at 1317.

11          It is a fundamental precept of claim construction that claims are to be construed in

      light of the specification presented in the patent document. *Merck & Co., Inc. v. Teva

12   Pharms. USA, Inc.*, 347 F.3d 1367, 1370 (Fed.Cir.2003); *Phillips*, 415 F.3d at 1315-16 ("The

13   best source for understanding a technical term is the specification from which it arose,

14   informed, as needed, by the prosecution history.") (quoting *Multiform Desiccants*, 133 F.3d

      at 1478). In particular, coined terms and idiosyncratic language employed by the inventor are

15   "best understood by reference to the specification." *3M Innovative Properties Co. v.

16   Tredegar Corp.*, 725 F.3d 1315, 1321 (Fed. Cir. 2013).

17          Where a patentee has provided her own definitions for claim terms, the claim is

18   construed according to the patentee's expressed intent, even if the resulting construction

      departs from the ordinary meaning of the claim language. *Phillips*, 415 F.3d at 1316;

19   *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 493 F.3d 1358, 1361 (Fed.Cir.2007)

20   ("When a patentee defines a claim term, the patentee's definition governs, even if it is

      contrary to the conventional meaning of the term.") "The applicant may also act as his own

21   lexicographer and use the specification to implicitly or explicitly supply new meanings for

22   terms." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1367 (Fed.Cir.2003).

23          Though claims should be interpreted in light of the specification, it is not generally

      appropriate to import limitations from the specification into the claims. *North American

ORDER ON CLAIM CONSTRUCTION - 6

*Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1348 (Fed.Cir.2005) ("[U]nless required by the specification, limitations that do not otherwise appear in the claims should not be imported into the claims."); *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 412 F.3d 1284, 1289 (Fed.Cir.2005) ("We have repeatedly made clear that limitations cannot be imported from the specification into the claims."); *SciMed Life Systems., Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1340 (Fed.Cir.2001) (referring to the plaintiff's characterization of reading a limitation from the written description into the claims as "one of the cardinal sins of patent law").

At the same time, "the claims cannot be broader in scope than the invention that is set forth in the specification." *On Demand Machine v. Ingram Industries*, 442 F. 3d 1331, 1340 (Fed. Cir.2006). The determination of balance point between these two considerations—interpreting the claims in light of the specification, on the one hand, and guarding against improperly importing limitations from the specifications into the claims—turns on "how the specification characterizes the claimed invention." *Alloc, Inc., v. International Trade Commission*, 342 F. 3d 1361, 1370 (Fed.Cir. 2003).

The scope of a claim is usually not limited to the particular embodiment or embodiments described in the specification. *See, e.g., Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1364-65 (Fed.Cir.2003) ("[A] particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment.")  In order to determine whether the limitations of an embodiment should be applied to a claim, a court must determine whether a person of skill in the art would consider the embodiments to be merely exemplary, or whether they are intended to define the scope of the claim. *Phillips*, 415 F.3d at 1323; *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1290 (Fed.Cir.2006).

The prosecution history, also part of the intrinsic evidence, may "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317; *see also Invitrogen Corp.*, 327 F.3d at 1367 ("[A]n applicant may actually disclaim claim scope during prosecution."). However, the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317.

ORDER ON CLAIM CONSTRUCTION - 7

While a district court may consult extrinsic evidence as part of the claim construction analysis, such evidence is considered less reliable than the intrinsic evidence. *Id.* at 1317-19 ("[T]he court should keep in mind the flaws inherent in each type of [extrinsic] evidence and assess that evidence accordingly."). "Extrinsic evidence is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles." *Vitronics,* 90 F.3d at 1584.

Among available extrinsic evidence, the court may use general purpose dictionaries as an aid to claim construction, so long as the dictionary definition relied upon does not contradict the definition indicated by the intrinsic evidence. *See id.* at 1322-23 (stating that courts "may ... rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents."). The Federal Circuit has specifically noted that dictionaries may be useful in the construction of ordinary, non-technical terms, which often involves "little more than the application of the widely accepted meaning of commonly understood words." *Id*. at 1314; *see also, Agfa Corp. v. Creo Prods. Inc*., 451 F.3d 1366, 1376 (Fed.Cir.2006) (affirming district court construction of "stack" based on dictionary definition); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1306 (Fed.Cir.2006) (using dictionary definition in construction of claim term "geometry"). However, excessive reliance on dictionary definitions is improper because the "ordinary meaning" of a claim term is not the abstract dictionary definition, but the "meaning to the ordinary artisan after reading the entire patent." *Phillips*, 415 F.3d at 1321.

These numerous guidelines notwithstanding, "there is no magic formula or catechism for conducting claim construction," and a court is not "barred from considering any particular sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Id*. at 1324. Instead "what matters is for the court to attach the appropriate weight ... to those sources in light of the statutes and policies that inform patent law." *Id*.

## ANALYSIS

Before turning to the specific claim terms at issue, the Court resolves two overarching areas of dispute between the parties: (1) whether the '309 Patent solely claims an accessory hardware device or whether the TVA can also be embodied as a software

ORDER ON CLAIM CONSTRUCTION - 8

1    solution, and (2) whether the Patent limits the TVA to providing a non-interactive link

2    between the computer and a passive display monitor or whether it can support bidirectional

     flow of information.

3           In answer to this first question, the language of the claims as well as the patent

4    specification provide repeated references to the TVA as an accessory hardware device added

5    to an existing computer. Claim 1, for instance, distinguishes the TVA from the physically

     and functionally separate computer to which the TVA device is attached. *See* '309 Patent at

6    24:55-56 (claiming a "multiple monitor video display method for use with a computer").

7    Other claims make clear that the TVA is a distinct device that is "physically intercoupled"

8    with the computer and monitors through various data ports. *See, e.g.*, Claim 9, *id.* at 27:1-3

9    (claiming the step of "intercoupling the display-ready video signal between the video output

     port, a [TVA] and the first monitor").

10          The specification, in light of which the Court interprets the claims, *Phillips*, 415 F.3d

11   at 1313, also makes repeated reference to the TVA as a device distinct from the computer.

     The TVA is described, for instance, as a "standalone peripheral." *Id.* at Abstract. Both the

12   external and internal embodiments set forth in detail in the specification contemplate the

13   invention as a distinct accessory device. *See, e.g., id.* at 6:30-44 ("A preferred embodiment

14   for my invention is as a standalone accessory device that simply plugs in series with the

     video cabling"); *id.* at 9:65-10:7 ("[M]y TVA may be conveniently built upon a plug-in

15   printed circuit assembly which is temporarily inserted into one of the available expansion

16   bus slots ordinarily associated with a typical personal computer."); *id.* at 7:13-17 (explaining

17   that the internal "TVA essentially taps-into and accepts a sample of display-ready processed

18   video which ordinarily routes from the computer's usual video processor circuitry directly to

19   the primary video monitor for immediate presentation"); 7:35-39 ("It is urgent to realize and

     bears repeating that my invention, whether internally mounted as a plugin card or externally

20   located, strictly samples the real-time process and monitor ready video data signal….").

21          While the external TVA is inherently physically distinct, the specification makes

22   clear that the internal nature of the second TVA embodiment does not transmogrify the

     device from hardware into software simply because it is inserted into the computer's card

23   reader. Much like a USB flash drive, the TVA exists as a removable hardware accessory

     device regardless of the fact that it functions by being inserted into a computer's data port.

ORDER ON CLAIM CONSTRUCTION - 9

*See id.* at 22:60-62 ("It is well known practice to use the expansion bus 334 for purpose of *adding accessory cards and this is no exception*.") (emphasis added). The Patent's depiction of the two TVA embodiments makes clear the device's singular accessory nature: in the internal embodiments, the TVA is shown as a "plug-in printed circuit card," *id.* at Fig. 16 & 22:56-58, while in the functionally identical external embodiment, the TVA is shown as a "separate freestanding device," *id.* at Fig. 17 & 23:31-33.

The Patent's descriptions of the TVA's functionality also emphasize that it functions independently from the computer and its operating systems, rather than as either hardware that is part of the computer itself or as software that runs on the computer. *See, id.* at 14:64-66 ("The Fig. 1 depiction shall underscore a key aspect of my invention that being the TVA 20-1 is *functionally distinct* from computer 10.") (emphasis added). Indeed, Weber emphasized the accessory nature of the TVA as integral to its advances over prior art, by allowing the device to function flexibly on any operating system. *See id.* at 6:18-29 (providing that the "paramount advantage" of the TVA is its ability to function "equally well with any operating system and in any computer hardware configuration"); 23:62-66 (describing the TVA as "merely an accessory to the computer 360").

Given that the Patent clearly specifies the TVA's essential accessory nature, Secure Axcess's contention that the Patent claims both software and hardware solutions is not surprisingly without support in the intrinsic evidence. Secure Axcess relies on the portions of the specification that describe a "Transient Stay Resident" (TSR) software program. The TSR program, which is run on the computer itself, allows the user to execute a keyboard sequence in order to command the grabbing of a video frame fed onto the primary monitor. *See id.* at 7:52-55 ("With the internally located TVA a [TSR] subroutine program may conveniently serve to implement video frame grabbing in unique response to certain predeterminable patterns of keystroke sequence entries.").

Contrary to Secure Axcess's representations, the specification makes clear that the TSR is not part of the TVA itself but is instead a separate software solution that provides one means by which the TVA can be "trigger[ed]." *Id.* at 7:57-61 ("Although a TSR triggered instruction obtained from the computer's control bus is utilized to trigger my invention into action it remains to be absolutely understood that it is the post-processed video signal which is grabbed, sampled, and temporarily stored."). The sole figure depicting the role of the TSR

ORDER ON CLAIM CONSTRUCTION - 10

software, Figure 7, also clearly shows that the TSR software is run on computer 10, which is visibly distinct from TVA 50. *See id.* at Fig. 7; *see also id.* at 16:43-44 (explaining that in Figure 7, "a TSR software program 11 is appears [sic] loaded into the computer 10"); 12:49-60 ("[A] programmer may create a TSR software routine which can be installed in the computer.").

The second question – whether the TVA can support bidirectional flow of information – is directly answered by reference to the prosecution history. The Patent's depiction of the TVA's operations clearly shows information flowing only in one direction, from the computer through the TVA to the display monitors. *See, e.g.*, *id.* at Figs. 5-7. While the Patent document in one place describes a TVA embodiment as containing a "bi-directional data line," *id.* at 19:51-55, Weber explicitly disavowed bidirectional functionality during the prosecution of the Patent in order to distinguish his invention from prior art. He did so by emphasizing that the TVA "serves as a **NON**-interactive link between the processed video signal output port" and the passive monitor. *See* Dkt. # 20, Ex. C at p. 60 (emphasis in original). Weber made this clarification after the examiner initially rejected his pending claims in light of a prior "Obata '669" patent. *See id.* at p. 57. Weber differentiated his device from that claimed in the Obata patent by explaining that the TVA's capture of processed data flowing "forth from the computer to a video input port of the display monitor" is "absolutely contrary to the two-way network-style operation here-to-fore taught by and anticipated by the Obata et al '669 reference." *Id.* at 60-61 (emphasis in original).

This express disavowal unequivocally limits the scope of the TVA to providing a non-interactive link between processed video signal and a passive display monitor. Even if this limitation were not already clear from the specification, the Court must give affect to Weber's disavowal of an interpretation of the TVA to allow bidirectional data flow made during prosecution in order to obtain claim allowance. *Teleflex, Inc. v. Ficosa No. Am. Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002) (quoting *Standards Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985)); *see also Invitrogen Corp.*, 327 F.3d at 1367 ("[A]n applicant may actually disclaim claim scope during prosecution."); *Rheox*, 276 F.3d at 1325 ("Explicit arguments made during prosecution to overcome prior art can lead to narrow claim interpretations because the public has a right to rely on such definitive statements made during prosecution." *Id.* (internal quotation omitted)).

ORDER ON CLAIM CONSTRUCTION - 11

1      Having set forth these interpretations of the overall scope of the claims in the '309

2  Patent, the Court turns to construing the particular disputed terms.

3      (1) **Translative Video Adapter (Claims 1, 9, 13)**

4      Both parties agree that this term, which Weber coined to capture his invention,

requires construction. Secure Axcess proposes the following construction: "software and/or

5  hardware configured to accept video data for display on a primary video display device,

prepare and store the video data in memory, retrieve the stored video data from memory, and

6  prepare and transmit the stored video data for display on a secondary video display device."

7  *See* Dkt. # 20-1 (Parties' Joint Claim Construction Chart), at p. 4. Nintendo argues that the

8  term should instead be construed to mean an "accessory device added to an existing

computer system that provides a non-interactive link of the processed video signal from the

9  video output port to a passive display monitor." *Id.*

10     Secure Axcess first contends that Nintendo's proffered construction of the TVA as an

11 "accessory device" impermissibly imports limitations into claims from embodiments set

forth in the specification. The Court disagrees. This is not a case in which a party urges that

12 a claim term be limited to a single preferred embodiment in contravention of the ordinary

13 and accustomed meaning of that term. *Cf. Telflex, Inc.*, 299 F.3d at 1327 (holding that claim

terms take on their "ordinary and accustomed meanings unless the patentee demonstrated an

14 intent to deviate" from those meanings). Rather, because "TVA" is a coined term, *id.* at

15 9:55-56, its meaning must derive from the patent itself and not from any common usage. *See*

16 *Mymail*, 476 F.3d at 1376. As noted above, the '309 Patent's claims and specification plainly

17 teach the TVA as an accessory device added to an existing computer, whether as a

standalone accessory device (the external embodiment) or through a plug-in card (the

18 internal embodiment). By extension, the Patent nowhere describes the "software" TVA that

19 Secure Axcess proposes. Because a coined term may be construed "only as broadly as is

provided for by the patent itself," *Godlenberg v. Cytogen, Inc.*, 3273 F.3d 1158, 1164 (Fed.

20 Cir. 2005), the Court declines to adopt Secure Axcess's construction of the TVA as

21 "software and/or hardware."

22     Secure Axcess also argues that because Claims 1 and 9 are method claims, the TVA

23 term used in them should be construed functionally. Dkt. # 21, p. 13. As evidence that

Weber sought to purely claim function, Secure Axcess points to the Patent's generic

ORDER ON CLAIM CONSTRUCTION - 12

qualification that "the secondary display operating apparatus might take other forms which can be differently engineered to suit a particular application or meet special operational goals without departing from the fundamental spirit of my invention."*Id.* at 24:14-27.

There are several problems with Secure Axcess's approach. First, that Claims 1 and 9 may be method claims does not mean that they cannot refer to or incorporate structure. *See Eaton Corp. v. Rockwell Intern. Corp.*, 323 F.3d 1332, 1339-41 (Fed. Cir. 2003) (noting that "[t]he presence of [specific] structures [in a method claim] permits the performance of the first step of the claimed method" and that the "plain language of the claim requires the operation of this structure as the first step of the claimed method."). Here, the term TVA appears in Claims 1 and 9 as structure – as a physical device to be "intercoupl[ed] with data signal and a monitor – not as a function. *See* '309 Patent at 24:65-6, 27:1-3.

Further, purely functional claiming is permitted only where a term is presented as either a "means-plus-function" term or "step-plus-function" term under the requirements of 35 U.S.C. § 112(f). In drafting a "means-plus-function" claim, such as Claim 13, the patentee is required to link the claimed function to associated structure set forth in the specification. *Noah Systems, Inc. v. Intuit Inc.*, 675 F.3d 1302, 1318 (Fed. Cir. 2012). "Requiring the disclosure of a corresponding structure, thus, confines the breadth of protection otherwise permitted by purely functional claiming." *Id.* (internal quotations omitted). Claims 1 and 9 are not drafted as mean-plus-function claims.

Finally, reading generic functional claiming language in the specification to enlarge the scope of the claimed invention would undermine the notice function of the patent. *See Johnson & Johnston Associates Inc. v. R.E. Service. Co., Inc.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002) ("The claims thus give notice of the scope of patent protection."). The specification may be referred to in order to limit the claim but "can never be made available to expand it." *McClain v. Ortmayer*, 141 U.S. 419, 424 (1891); *see also SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question."). The Court thus rejects the proposition that the specification's generic reservation can be used to expand the scope of

ORDER ON CLAIM CONSTRUCTION - 13

claims such that they become entirely untethered from the embodiments described in the specification. *See id.* at 1344 (holding, despite the presence of a generic reservation in the patent, that the scope of the asserted claims was limited to a preferred embodiment); *see also Wang Laboratories, Inc. v. America Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999); *Embs v. Jordan Outdoor Enterprises, Ltd*, 617 F.Supp.2d 680, 693 (S.D. Ohio 2008).

The Court thus turns to the remaining portions of the parties' proposed constructions for the TVA term. For the reasons set forth above, the Court is persuaded by its reading of the prosecution history that the inventor disclaimed any bidirectional data flow capability in distinguishing the '309 Patent from prior art. In accordance with this disavowal, the Court determines that the TVA is limited to a "non-interactive link" connected to the computer's "video output port." *See* Dkt. # 20, Ex. C, p. 60 ("[A TVA] serves as a **NON**-interactive link between the <u>processed video</u> signal output port and a mere passive display monitor.") (emphasis in original).

Similarly, the prosecution history and the patent language unambiguously require that the TVA be connected to the computer's "video output port" so that it can sample video signals "directly from the computer system's primary display monitor's fully processed video data stream, as opposed to obtaining the raw video data signal from the computer's internal data bus signals." '309 Patent at 6:10-14; *see also*, 7:61-63. Indeed, the Patent describes the TVA's limitation to sampling processed video signal from the video output port as essential to "avoid[ing] a variety of predecessor display errors" which sampling from "raw bus signals" would introduce. *Id.* at 7:29-32.

The Court finds that Nintendo's proposed construction properly encapsulates these essential structural limitations, which are left out of Secure Axcess's proposed construction. The Court accordingly adopts Nintendo's construction and construes the term "TVA" to mean an "accessory device added to an existing computer system that provides a non-interactive link of the processed video signal from the video output port to a passive display monitor."

(2) **Predecessory Display/Supplementary Video Data/Predecessory Video Data Display (Claims 1, 9, and 13)**

Only Nintendo asserts that these terms require construction, while Secure Axcess contends that they require no construction beyond their plain and ordinary meaning.

ORDER ON CLAIM CONSTRUCTION - 14

Nintendo proposes the following construction: "static and accurate replication of a single full frame previously displayed on a different monitor."

The Court agrees with Nintendo that it is appropriate to construe these terms at this stage of the proceeding. The term "predecessory" in particular was coined by the inventor and has no meaning outside the Patent. Further, the parties dispute Nintendo's proposed construction of these terms as limited to a "static" replication of a "single full frame." Such disputes over the scope of claims must be resolved by the court and not left to the jury to determine. *See Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1316 (Fed. Cir. 2010) ("[W]hen the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve the dispute.") (internal quotations omitted).

Here, the Court agrees with Nintendo's proposed construction. First, the claims themselves require that the predecessory or supplementary image is first displayed on a different monitor before being displayed on the second monitor. *See* '309 Patent at Claim 1, 24:54-25:16 (claiming steps of "first displaying the first processed video data signal on the first monitor as the real time display," "reading" the video data, "converting it into a "first predecessory video signal," and "displaying the first predecessory video signal on a second monitor as the first predecessory display."); *see also* Claims 9 & 13; 5:34-36 ("predecessory refers to a historical store or supplementary display of video data").

Second, the specification throughout describes the predecessory display as a static image and as an accurate replication of a previous frame. *See, e.g., id.* at 7:39-43 ("My TVA stores a true 'what you see' frame sample for subsequent 'what you get 'display on a second monitor as an accurate replica of a predecessory image that has been recently displayed on the primary monitor."); 4:44-60 ("[Y]ou grab the video signal and store it for readout and replicate display on the secondary monitor. In effect the display becomes '*locked onto*' the secondary monitor.") (emphasis added). The prosecution history confirms these attributes. *See* Dkt. # 20, Ex. C at p. 61 ("The eloquence of my invention is that a faithful duplication of whatever video processing the computer's usual built-in video circuitry provides is absolutely duplicated so as to precisely replicate the primary [] display presentation on the secondary monitor."). The static nature of the predecessory display flows from the TVA's limitation to providing a "non-interactive" link from the data source to the display monitor.

ORDER ON CLAIM CONSTRUCTION - 15

1

2          Third, reading these terms in light of the specification makes clear that the

predecessory display is limited to providing a full screen display. Indeed, the Patent

3    describes the "supplementary full screen display[] of portions of a document" as "the utter

essence" of the claimed invention. '309 Patent at 24:7-11; *see also*, *id.* at 6:45 ("TVA Stores

4    Full Video Screen Frame"); 9:47-53 ("The stored data are subsequently read-out and

5    displayed on the secondary (i.e. supplementary or satellite) monitor to serve to display full

screens of pre-occurring reference information….").

6          Secure Axcess nonetheless points to the Patent's use of the verb "sample" to argue

7    that the predecessory display need not be limited to a full screen. The Court finds this

8    reference inapposite. The specification employs the verb "sample" in reference to the

sampling of the processed video data stream. *See id.* at 6:9-14 (discussing the sampling of

9    "fully processed video data stream"); 7:13-15 ("the TVA essentially taps-into and accepts a

10   sample of display-ready processed video"). In other words, the user executes a command to

11   sample, or grab, from the video data stream the full screen of data displayed on an initial

monitor. In accordance with this prescribed limitation, the Patent consistently depicts a full

12   frame on a primary monitor being exactly replicated onto the secondary monitor. *See id.* at

13   Figs. 1-3. As the Patent nowhere discloses a method for capturing only a portion of a full-

14   frame image, the Court declines Secure Axcess's invitation to read the scope of the claims

more broadly than the specification provides.

15         Finally, the Court agrees with Nintendo that the terms "predecessory display" and

16   "supplementary display" should be construed interchangeably. "[C]laim drafters can [] use

17   different terms to define the exact same subject matter." *Curtiss-Wright Flow Control Corp.*

*v. Veland, Inc.*, 438 F.3d 1374, 1380-81 (Fed. Cir. 2006). Such is the case here. Claim 9, for

18   instance, uses the term "supplementary display" in the precise fashion in which the term

19   "predecessory display" is used in Claim 1. *Compare*, '309 Patent at 25:13-15 (claiming steps

20   of "converting the first read said first video data signal into a first predecessory video signal"

and "displaying the first predecessory video signal on a second monitor as the first

21   predecessory display") *with* 27:16-19 (claiming steps of "converting the first read said first

22   stored data into a supplementary display video signal" and "rendering the supplementary

23   display video signal on the second monitor"). The specification confirms that these terms

ORDER ON CLAIM CONSTRUCTION - 16

have the same meaning. *See, e.g.*, 5:35-36 ("predecessory refers to a history store or supplementary display of video data"); 24:34-48.

The Court finds Nintendo's construction of these terms to be that contemplated by the inventor and necessitated by the specification. The Court accordingly adopts Nintendo's construction of these "predecessory" terms, which are construed to mean the "static and accurate replication of a single full frame previously displayed on a different monitor."

(3) **First sample of first screen portion/first sample of first screen data signal (Claims 1 and 9)**

Again only Nintendo asserts that these terms require construction. Nintendo proposes the following construction: "static and accurate replication of a single full frame previously displayed on a different monitor."

The dispute over the construction of these claim terms mirrors the dispute over the "predecessory" terms discussed above. Nintendo asserts that these terms should be construed to incorporate the "static and accurate" and "full image" requirements of the "predecessory" and "supplementary" display terms. According to Nintendo, these requirements flow directly from the language of Claims 1 and 9, which makes clear that these "first sample[s]" are stored into memory and subsequently read out as a "predecessory" or "supplementary" display. Secure Axcess, by contrast, asserts that these terms, if in need of construction, should be construed to make clear that Mr. Weber's invention enables a computer user "to select a first sample of a first screen portion." Dkt. # 24, p. 10.

The Court agrees with Nintendo that it is appropriate to construe these terms, in light of the ambiguity in the term "sample" and the parties' evident dispute with respect to its scope. *See Pressure Prods. Med. Supplies, Inc.*, 599 F.3d at 1316. For the reasons set forth above with respect to the "predecessory" terms, the Court is also persuaded that Nintendo's construction is the correct one. It is clear from the language of the claims and from the specification that the "sampling" referred to in the Patent is the sampling of full frames of data from the processed data stream. *See, e.g.*, '309 Patent at 24:7-14. The context of Claim 1 makes clear that the term "portion" refers to the user's ability to select a "portion" of processed video data signal, not to a "portion" of the image displayed on a first monitor. *See* 25:1-3 ("first enabling the computer user to select a first sample of a first screen portion *of the first processed data* signal") (emphasis added).

ORDER ON CLAIM CONSTRUCTION - 17

The Court accordingly adopts Nintendo's construction and construes the terms "first sample of a first screen portion/ first sample of the first screen data signal" to mean "first static and accurate replication of a single full image of a first screen frame."

(4) **Port Terms (Claim 1, 9, and 13)**

The term "port" is used in five places in Claim 1, 9 and 13. Secure Axcess asks the Court to construe this term in isolation to mean: "Any internal or external data channel through which data enters or exits." Nintendo instead points out that the term "port" is never given independent significance in the claims but is instead always attached to a specific type of port (e.g., the TVA input port and the video signal output port). Nintendo therefore asks the Court to construe the word "port" in the asserted claims in the context of the specific types of ports being claimed.

As the term "port" is always claimed as a particular type of port and modified by other terms, the Court agrees that construing the term "port" in isolation would lead to an overly broad construction and one ultimately unhelpful for the trier of fact. The Court accordingly follows Nintendo's suggestion and construes each of the following "port" terms in context.

**(a) TVA Input Port (Claims 1 and 2)**

While Secure Axcess urges no interpretation of this term beyond its proposed independent construction of the term "port," Nintendo proposes that the term "TVA Input Port" be given the following construction: "an input termination or connection point in the TVA that allows for a device to be detachably connected to the TVA."

Secure Axcess contends that Nintendo's proposed construction makes little sense because "Mr. Weber patented a *method*." Dkt. # 24, p. 10 (emphasis in original). As such, the TVA, according to Secure Axcess, cannot be detachable because Weber intended to describe it solely in terms of its function. The Court disagrees. As discussed above, structural detail is routinely included in method claims. Indeed, recitation of structure is often necessary, for it may be through the presence of certain structures that the steps of a claimed method are performed. *See Eaton Corp.*, 323 F.3d at 1339 ("The presence of these structures permits the performance of the first step of the claimed method….").

Here, it is clear from the language of Claims 1 and 2 that both the TVA and the "TVA input port" are structures necessary to the performance of the steps of the claimed

ORDER ON CLAIM CONSTRUCTION - 18

method. The "TVA input port" is "intercoupled" in both these claims with the "processed video data signal" from the computer. *See* '309 Patent at 25:1-4; 25:19-21. In other words, it is the presence of the "TVA input port" that allows for the TVA to be attached to a device in order to receive the processed video signal to be read out onto a secondary monitor.

The specification also makes clear the detachable nature of the TVA, which is connected to a device through its input port. Both the external and internal TVA embodiments (the only two embodiments disclosed in the Patent) are described as being detachably connected to the computer via an input port. For instance, the "freestanding" external TVA is "coupled" with the computer through a "cable [] with an input into the TVA [.]" *Id.* at 23:36-38. Likewise, the internal TVA embodiment is described as containing a "necessary third connector (actually the input to the TVA)." *Id.* at 23:19. This detachable connection is described elsewhere throughout the specification. *See, e.g.*, *id.* at 6:32-35 ("[A] short video 'jumper' cable may connect between the computer's video output connector…and an input to my TVA device."). Construing the term "TVA input port" to make clear that the TVA may be detachably connected to a computer is thus consistent with the specification, including both embodiments, the accessory nature of the TVA, and the lauded ability of the TVA to function on any operating system. *See Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) ("[C]laims must be construed to be consistent with the specification, of which they are a part.").

Accordingly, the Court adopts Nintendo's proposed construction and construes the term "TVA input port" to mean: "an input terminal or connection point in the TVA that allows for a device to be detachably connected to the TVA."

(5) **Video Output Port/Video Data Signal Output Port (Claims 9 and 13)**

While Secure Axcess argues that no construction is necessary for these terms beyond that proposed for the term "port," Nintendo proposes that the terms be construed as "an output terminal or connection point adapted to be detachably connected to a monitor."

As used in the claims, the terms "video output port" and "video data signal output port" plainly provide the connecting point between the TVA and the monitor, consistent with Nintendo's proposed construction. *See* '309 Patent at 27:1-3 (claiming the step of "intercoupling the display-read video signal between the video output port, a translative video adapter (TVA) and the first monitor); 27:63-65 (claiming "a primary monitor means

ORDER ON CLAIM CONSTRUCTION - 19

coupled with the first processed video data signal output port and producing an immediate display of the processed video data signal").

Nintendo's proposed construction is also consistent with the specification, every embodiment of which includes an output port that allows the TVA to physically connect to a monitor. *See, e.g.,* '309 Patent at Abstract ("The device is preferably configured as a standalone peripheral, having two video ports connected essentially between the computer's 'video output port' and a third video port coupled with the secondary monitor's 'video input' port."); 6:30-30 ("A preferred embodiment for my invention is as a standalone accessory device that simply plugs in series with the video cabling…The primary monitor and secondary monitor then each plug into appropriate mating connectors outputted from my TVA device"); 10:19-21 ("The original or principal VGA video monitor is subsequently plugged into a connector provided on my TVA card."); 18:19-23.

The Court accordingly adopts Nintendo's proposed construction and construes the terms "video output port" and "video data signal output port" to mean "an output terminal or connection point adapted to be detachably connected to a monitor."

(6) **Ported Source (Claim 1)**

Secure Axcess proposes that "ported source," which appears only in Claim 1 of the Patent, be construed to mean "any internal or external data channel through which data may be obtained." Nintendo, by contrast, proposes that the term be construed as a "video output port of a video adapter or graphics accelerator card."

Nintendo contends that Secure Axcess's construction of "ported source" should be rejected because it is disconnected from the context of the claim language. The Court agrees. Claim 1 recites the steps of "processing computer program data into a ported source of display-ready first processed video data signal," "intercoupling the ported source of first processed video data signal and the first monitor," and "intercoupling the ported source of first processed video data signal and a [TVA]." '309 Patent at 24:59-60, 24:65-66. In context, the term "ported source," like "video output port," provides a connection between processed video signal and the monitor. The specification limits the source of the processed video signal to the video adapter card or graphics accelerator card, consistent with Nintendo's proposed construction. *See id.* at 7:43-46 ("[T]he INPUT to my TVA device is derived directly from the OUTPUT of the computer's usual video adapter card as monitor-

ready processed video signal."); 15:1-4 ("[T]he processed video data signal delivered from the computer is a display-ready video signal which has been processed through a video adapter or 'graphic accelerator' card.").

Accordingly, the Court adopts Nintendo's proposed construction and construes the term "ported source" as a "video output port of a video adapter or graphics accelerator card."

(7) **Usually (Claim 1)**

Secure Axcess asserts that this term, which appears only in Claim 1, needs no construction, while Nintendo urges the Court to find that the term is indefinite. As to this term, the Court agrees with Secure Axcess and finds no construction beyond the ordinary meaning of this term necessary. The Court further defers the question of indefiniteness, as it is appropriately resolved at the summary judgment stage rather than through claim construction. *See Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1376 (Fed. Cir. 2001); *MasterObjects, Inc. v. Yahoo!, Inc.*, 2013 WL 6185475, *1 (N.D. Cal. 2013).

(8) **First converting the first read said first video data signal into a first predecessory video signal/first converting the first read said first stored data into a supplementary display video signal (Claims 1 and 9)**

Secure Axcess asserts that no construction is necessary as to these terms, while Nintendo proposes the following construction: "reconstructing the stored digital video data signal into an analog first predecessory video signal."

The dispute between the parties as to these claim terms centers on whether the claimed "converting" steps result in an analog signal. The Court agrees with Nintendo that they do. The specification consistently employs the terms "converter" and "conversion" to refer to either analog-to-digital (A/D) or digital-to-analog (D/A) conversion. *See, e.g.*, '309 Patent at 9:56-62 ("In effect my TVA accepts the processed video signal from the computer, first translates the video signal into binary format for digital memory storage. The digital memory is subsequently read-out and the retrieved binary format data is then secondly translated back into a reconstructed processed video signal format."); 10:26-30 ("The memory is repeatedly read out to three video speed DAC (D/A converters….); 11:20-24 ("The stored memory output data are subsequently utilized with a D/A (digital to analog) converter to reconstruct the analog video signal…."); Fig. 11 (items 74 and 110); 18:65-19:16.

ORDER ON CLAIM CONSTRUCTION - 21

The Court disagrees with Secure Axcess that references in the description to processes through which D/A or A/D conversion is not required, change this result. Secure Axcess points, for instance, to a description of the use of an external adapter coupled with a "TTL signal level video monitor." *Id.* at11: 33-37 ("Since the usual video signals are inherently binary in these earlier [TTL] display monitors, they do not require A/D conversion[.]"). This reference is inapposite. First, it is never incorporated into any embodiment set forth by the inventor. Second, the Patent's discussion of TTL monitors is in relation to a process through which "conversion" is *not* required. That is, the TTL reference does not provide a more expansive construction of "conversion;" rather, it discusses its absence. The Court declines to read the claims so as to obviate the step of "conversion" entirely, as Secure Axcess urges. Reading "conversion" in light of the specification, as the Court must, it is clearly intended to refer to digital-to-analog translation.

The Court accordingly adopts Nintendo's proposal and construes these terms to mean "reconstructing the stored digital video data signal into an analog first predecessory video signal."

(9) **Means-Plus-Function Terms (Claim 13)**

Claim 13 of the '309 Patent includes nine terms drafted using means-plus-function claim language, governed by 35 U.S.C. § 112(6). The parties have identified six such terms in their Joint Claim Construction and Prehearing Statement for which they have requested construction. The Court agrees that it may ultimately be necessary to construe all of these terms. *See* 35 U.S.C. § 112(f) (means-plus-function claims "shall be construed to cover the corresponding structure, material, or acts described in the specification"). Nonetheless, as doing so will exceed the maximum ten terms ordinarily construed at this stage, the Court finds it appropriate to construe only the following three terms at this time, which it finds to be most relevant to issues dispositive of Claim 13. In identifying corresponding structure, the Court looks to clear associations between recited function and structure set forth in the specification or prosecution history. *B. Braun Medical, Inc. v. Abbott Laboratories*, 124 F.3d 1419, 1424 (Fed. Cir. 1997).

a.   **TVA Means**

The parties disagree as to both the function and corresponding structure for this term. Nintendo proposes the following function: "Using an accessory device added to an existing

computer system to provide a non-interactive link of the processed video signal from the video output port to a passive display monitor," which it links to the following structures: TVA 330 (Fig. 16) or TVA 370 (Fig. 17). Secure Axcess proposes the following construction: "Accepts video data from a source and provides the video data to one or more displays in response to a bidirectional protocol," which it links to the following structures: Figs. 7 (Refs. 10, 11, 50) or 12.

The parties' dispute over the functional definition replicates the dispute over the claim term "TVA," discussed above. For the reasons already stated, the Court adopts Nintendo's proposed construction, which properly incorporates the inventor's prosecution disclaimer and tracks the scope of the function set forth for the TVA in the specification. The Court further adopts Nintendo's proposed structure, which encompasses the only two embodiments of the TVA set forth in the Patent, as shown in Figures 16 and 17. *See* '309 Patent at 22:56-60, 23:31-33.

The Court also agrees with Nintendo that Secure Axcess's proposal links "TVA means" function to the incorrect structure. Computer 10 in Figure 7, for instance, is the "computer means" referred to in a prior step of Claim 13. *See id.* at 27:61-62. TSR 11 in Figure 7 refers to software run on the Computer 10, which may be used to help initiate a screen grab but which is not part of the TVA means itself. *See id.* at 1:37-41. Further, identification of the entire structure depicted in Figure 12 incorporates additional structure clearly distinct from the TVA, such as the secondary video monitor 32 and serial port connection 150.

The Court accordingly adopts Nintendo's proposed function and structure for "TVA Means."

### b. First Operative Means

Nintendo proposes the following functional compromise construction for "First Operative Means": "Enabling a user to first select and capture a first page sample from the first processed video data signal path." Nintendo links this function to the following compromise structure: "(1) a dedicated "button," either an "external button switch" or a "third 'mouse' button" (Fig. 5 Accessory Key-Switch 16, Fig. 11 Push button Switch 67, Fig. 17 Key Button Switch 362), or (2) Fig. 7 Unique Keystroke Entry 15 in combination with Keyboard 14, and TSR Program 11, either of which is  combined with both "Frame

ORDER ON CLAIM CONSTRUCTION - 23

Grabber Control Logic" 68 and "Memory Control Logic" 96 in Fig. 11. Secure Axcess proposes the following function: "Enabling the user to [first/second] select and capture a [first/second] accurate replication of a data sample from the [first/second] processed video data signal." Secure Axcess links this function to the following structure: (1) Fig. 7 Unique Keystroke Entry 15 in combination with Keyboard 14, Computer 10, TSR Program 11, and TVA 50; or (2) Fig. 12 UART 154 in combination with Data Synch and R/W Control Logic 190-10.

    First, the Court adopts Nintendo's proposed function, which tracks the unambiguous language set forth in Claim 13 itself. '309 Patent at 28:5-7. Secure Axcess's proposed function, by contrast, unjustifiably departs from the plain language of the Claim and introduces unnecessary ambiguity.

    As to corresponding structure, the Court finds that Nintendo properly identifies the structure associated with "first operative means" function throughout the Patent. The Patent contemplates three alternative structures through which the TVA is initially triggered: a dedicated button, dedicated mouse, or a keystroke sequence. *See id.* at 1:37-41 ("A primary display video screen selection is made by actuation of an auxiliary key-switch associated with the adapter, by a 'third' mouse button entry or by a unique keyboard sequence entry processed by a TSR program to enable the necessary function."); *see also id.* at Abstract ("User selection may be attained by a keyboard key sequence entry, a mouse button click or using an external button-switch"). No other structures for executing the first operative means are identified in the specification, and the Court declines to read Claim 13 more broadly than the Patent allows.

    As to structure, Nintendo's proposal properly links the first operative means to these identified structures through which it is executed. Secure Axcess's proposal, by contrast, excludes the external key-switch and mouse button structures associated with the "first operative means" function throughout the Patent. Secure Axcess also seeks to improperly associate Computer 10 and TVA 50 with the first operative means function, though both these structures are associated with separate functions set forth in Claim 13, as discussed above.

    Accordingly, the Court adopts Nintendo's proposed compromise function and associated structure for "First Operative Means."

ORDER ON CLAIM CONSTRUCTION - 24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

c. **First Conversional Means**

Nintendo proposes the following function for the "first conversional means" term: "Adapting the first page sample of the first processed video data signal into a first storable video data signal," which it links to the structure of A/D Converter 74 in Figure 11. Secure Axcess proposes the following function: "Adapting the data sampled on the first page of video data into a first storable video data signal," which it links with the following structure: Figure 12 UART 154 in combination with Write Processor 170 and Data Synch R/W Control Logic 190-1.

As to function, the Court again finds it appropriate to adopt Nintendo's proposal, which tracks the unambiguous language set forth in the claim. '309 Patent at 28:8-10. For the reasons set forth above with respect to the "conversion" terms, the Court also finds that the specification necessitates linking the conversional means to the analog-to-digital conversion structure, as depicted in Figure 11. *See id.* at 11:12-15 ("In this preferable arrangement, the video signal coupled with the TVA is ordinarily in analog format and suitable A/D (analog to digital) conversion is performed."); 18:44-53. Further, the Court finds that Secure Axcess incorrectly attempts to associate Figure 12 with Claim 13. Claim 13 requires a "computer means including a first processed video data signal output port," which is depicted in Figure 11 but noticeably absent from Figure 12, an alternative serial port embodiment that does not include a video data signal output port.

The Court accordingly adopts Nintendo's proposed structure and function for the "first conversional means" term.

(10) **Display-ready first processed video data signal/processed video data signal/display ready video signal (Claims 1, 9, 13)**

The Court finds construction of these terms, urged only by Nintendo, to be duplicative with construction of the "First converting the first read said first video data signal into a first predecessory video signal" terms discussed above. As the Court has already reached the ten terms ordinarily construed as this stage, *see* Local Patent Rule 132, the Court declines to construe these terms at this time.

(11) **Intercoupling/intercoupled/coupled (Claims 1, 9, and 13)**

Having reached the ordinary ten term maximum at the claim construction stage, *see* Local Patent Rule 132, the Court declines to construe these claims at this time.

ORDER ON CLAIM CONSTRUCTION - 25

(12) **Predecessory video signal/supplementary display video signal (Claims 1 and 9)**

       The Court finds construction of these terms to be duplicative with construction of the "predecessory" terms discussed above. Having already reached the ordinary maximum of ten terms to be construed at this stage, *see* Local Patent Rule 132, the Court declines to separately construe these terms at this time.

**CONCLUSION**

       For the reasons stated herein, the Court hereby ORDERS that the disputed claim terms are construed as set forth above.

Dated this 8th day of July 2015.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER ON CLAIM CONSTRUCTION - 26